Mark M. Bettilyon (4798)
RAY QUINNEY & NEBEKER PC
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
mbettilyon@rqn.com

John Gary Maynard III (*Pro Hac Vice Pending*)
Paul T. Nyffeler III (*Pro Hac Vice Pending*)
HUNTON & WILLIAMS LLP
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone:  (804) 788-8720
Facsimile:  (804) 788-8218
jgmaynard@hunton.com
pnyffeler@hunton.com

Joshua M. Kalb III (*Pro Hac Vice Pending*)
HUNTON & WILLIAMS LLP
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Telephone:  (404) 888-4000
Facsimile:  (404) 888-4190
jkalb@hunton.com

*Attorneys for Defendant Lowe's Companies, Inc.*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| NOVELL, INC., a Delaware corporation, and NetIQ CORPORATION, a Delaware corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> LOWE'S COMPANIES, INC., a North Carolina corporation, <br><br> Defendant. | **ANSWER AND COUNTERCLAIMS** <br><br> Case No. 2:13-cv-00628-DB <br><br> Judge Dee Benson <br><br> (JURY TRIAL DEMANDED) |

Defendant Lowe's Companies, Inc. ("Lowe's"), as its Answer to the Complaint filed by Plaintiffs' Novell, Inc. ("Novell") and NetIQ Corporation ("NetIQ") (collectively, the "Plaintiffs"), states upon personal knowledge and/or information and belief as follows:

## ANSWER TO PLAINTIFFS' ALLEGATIONS

**All allegations in the Complaint are denied unless expressly admitted in the following responses to those allegations.**

### I.   PARTIES

1.      Novell is a Delaware corporation with its principal place of business located at 1800 South Novell Place, Provo, Utah 84606.

**ANSWER:    Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 1, and therefore denies those allegations.**

2.      NetIQ is a Delaware corporation with its principal place of business located at 1223 West Loop South, Suite 810, Houston, Texas 77027.

**ANSWER:    Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 2, and therefore denies those allegations.**

3.      Lowe's is a North Carolina corporation that conducts business nationwide with its principal place of business located at 1000 Lowe's Boulevard, Mooresville, North Carolina 28117.

2

**ANSWER:   Lowe's admits that it is a North Carolina corporation with its principal place of business located at 1000 Lowe's Boulevard, Mooresville, North Carolina 28117.  Lowe's denies the remaining allegations set forth in Paragraph 3.**

## II.   JURISDICTION AND VENUE

4.      This civil action (the "Action") arises under the Copyright Act, 17 U.S.C. § 101 *et seq*. and Utah common law.  This Court has jurisdiction over the subject matter of Copyright claims in the Action pursuant to 28 U.S.C. § 1331 and § 1338(a) and supplemental jurisdiction over the Utah state law claim under 28 U.S.C. § 1367.  This Court also has jurisdiction over both of the claims in the Action under 28 U.S.C. § 1332, in that there is diversity of citizenship between the parties and the amount in controversy on the claims exceeds $75,000.

**ANSWER:    Paragraph 4 states legal conclusions to which no response is required. To the extent Paragraph 4 alleges facts, Lowe's admits that Plaintiffs' Complaint purports to assert claims under the copyright laws of the United States and principles of state common law, but denies any other factual allegations.**

5.      This Court may exercise jurisdiction over Lowe's because it conducts business within Utah, entered into contracts in Utah, committed tortious acts that caused harm to Plaintiffs within Utah, made other relevant contacts in Utah, and this Action concerns the ownership, use, and possession of property situated in Utah.

**ANSWER:    Paragraph 5 of the Complaint states a legal conclusion to which no response is required.  Lowe's, however, denies that personal jurisdiction can be properly asserted over Lowe's in Utah without its consent; however, Lowe's does not dispute this**

Court's  exercise of personal jurisdiction in this specific action.  To the extent there are any factual allegations in Paragraph 5, Lowe's denies them.

6.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) & (c) and § 1400(a), as a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and a substantial part of the property that is the subject of this Action is situated in this district.

**ANSWER:    Paragraph 6 of the Complaint states a legal conclusion to which no response is required.  To the extent Paragraph 6 alleges facts, Lowe's denies them.**

### III.      FACTUAL BACKGROUND

### The Software and Services at Issue

7.      Plaintiffs are software development companies owned by The Attachmate Group, Inc.  Both companies have developed and distributed a variety of software products over the years.

**ANSWER:    Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 7, and therefore denies those allegations.**

8.      Novell Identity Manager ("IDM") is one of many software products developed by Novell.  IDM allows large enterprises to manage information across a variety of databases without duplicative effort.  For example, companies can use IDM to automatically provision a new employee's access rights to several resources, such as email accounts and address books. Companies can also use IDM to ensure that necessary information about their employees is

added to company databases, such as payroll and human resources systems. This eliminates manual setup and ensures that company information remains secure.

**ANSWER:   Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 8, and therefore denies those allegations.**

9.     IDM has a variety of "modules" that customers can choose to utilize with IDM. The modules are drivers that allow applications to communicate directly with the IDM engine. This allows changes in an application, such as email or payroll, to be communicated automatically to IDM and implemented throughout connected systems. Novell Identity Manager Integration Module for Enterprise ("Enterprise Module") is one of these modules.

**ANSWER:   Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 9, and therefore denies those allegations.**

10.     Ownership rights to IDM and its modules (collectively the "IDM Products") that originally belonged to Novell were assigned from Novell to NetIQ in 2011. Such assignment was duly recorded in the U.S. Copyright Office. Novell remains an authorized distributor of the IDM Products.

**ANSWER:   Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 10, and therefore denies those allegations.**

11.     The IDM Products contain material wholly original and consist of copyrightable subject matter under the U.S. Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*

**ANSWER:    Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 11, and therefore denies those allegations.**

12.     NetIQ owns, among others, the following copyright registrations:  Novell Identity Manager Version 3.0, Copyright Registration No. TX 6-314-018; Novell Identity Manager Version 3.5, Copyright Registration No. TX 6-585-353; Novell Identity Manager Version 3.6, Copyright Registration No. TX 7-232-497; and Novell Identity Manager Version 4.0, Copyright Registration No. TX 7-353-136 (collectively, the "Copyrights").

**ANSWER:    Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 12, and therefore denies those allegations.**

13.     Plaintiff's expended considerable effort and expense in developing and promoting the IDM Products.  As a result, the IDM Products are valuable, proprietary products and the software, its structure, sequence, and origin are valuable trade secrets.

**ANSWER:    Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 13, and therefore denies those allegations.**

14.     Because NetIQ owns the software, customers do not purchase the IDM Products, but instead purchase licenses for the IDM Products, paying a fee for each license.  Novell sold, and currently NetIQ sells, its IDM Products based on established price lists.

**ANSWER:    Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 14, and therefore denies those allegations.**

15.    Novell sold, and currently NetIQ, also sells annual maintenance services ("Maintenance") to customers.  Maintenance provides customers with access to the most current software version released during the Maintenance term and also provides customers with technical support services.  Novell sold, and currently NetIQ sells, Maintenance based on established price lists.

**ANSWER:    Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 15, and therefore denies those allegations.**

**Lowe's Signed Contracts That Establish Its License and Maintenance Obligations**

16.    Lowe's signed a Master License Agreement and Amendment to Master License Agreement (collectively the "MLA") with Novell in October 2000.  In April 2010, Lowe's signed an Instance-to-User License Conversion Addendum ("MLA Addendum") (the MLA and MLA Addendum are sometimes referred to herein as the "Contracts") that modified in certain respects the MLA.

**ANSWER:    Paragraph 16 states a legal conclusion to which no response is required.  Lowe's admits that it signed a Master License Agreement ("MLA") and Amendment to the Master License Agreement ("MLA Addendum") with Novell in October 2000 and that it signed an Instance-to-User License Conversion Addendum in April 2010.**

**To the extent there are any remaining factual allegations in Paragraph 16, Lowe's denies them.**

17.     The Contracts governed the parties' relationship and Lowe's license rights to the IDM Products and other products.

**ANSWER:   Paragraph 17 states a legal conclusion to which no response is required.  To the extent there are any factual allegations in Paragraph 17, Lowe's denies them.**

18.     The MLA Addendum established a "User License" for IDM Products.  It required that Lowe's "acquire a user license for each User." It defined "User" as follows:

> "User" means a user object in a single directory tree (or other class of object that contains data representing a person, such as objects containing credit card information or PIN numbers) that has (a) access or use rights to any portion of the Software, or (b) access or use rights to products (devices, hardware, or software) being managed by the Software, regardless of whether the user object is assigned to a person or device.  User objects (or other classes of objects) representing the same person that are linked to each other within a single tree and/or linked across multiple trees count as only one User.

**ANSWER:   Paragraph 18 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 18 to the extent that the use of a term defined in the MLA calls for a legal conclusion.  Answering further, Lowe's states that the MLA Addendum speaks for itself.  To the extent there are any factual allegations in Paragraph 18, Lowe's denies them.**

19.     The MLA Addendum provided Lowe's with a specific number of licenses for several IDM Products.  Among those were 280,000 User Licenses for IDM and 280,000 User

Licenses for the Enterprise Module.  Lowe's represented in the MLA Addendum that "the license numbers reported represent all licenses currently in use by Customer."

**ANSWER:  Paragraph 19 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 19 to the extent that the use of a term defined in the MLA Addendum calls for a legal conclusion.  Answering further, Lowe's states that the MLA Addendum speaks for itself.  To the extent there are any factual allegations in Paragraph 19, Lowe's denies them.**

20.     The MLA Addendum established that if Lowe's "usage exceeded" the number of licenses Lowe's owned for IDM and the Enterprise Module, then Lowe's would need to purchase additional licenses "according to Novell's then-current standard pricing. . . ."

**ANSWER:  Paragraph 20 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 19 to the extent that the use of a term defined in the MLA Addendum calls for a legal conclusion.  To the extent there are any factual allegations in Paragraph 20, Lowe's denies them.  Answering further, Lowe's states that the MLA Addendum speaks for itself.**

21.     The Contracts required Lowe's to purchase Maintenance annually for each IDM Product license that it deployed.  If Lowe's software deployment increased, Lowe's was required to purchase Maintenance for those new licenses at standard prices.

**ANSWER:  Paragraph 21 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 21 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's**

states that the Contracts speak for themselves.   To the extent there are any factual allegations in Paragraph 21, Lowe's denies them.

### The 2013 License Review Found Excess Users

22.     The MLA required Lowe's to conduct a self-audit at the beginning of the annual contract period, which was set as May 1 of each year.  Novell, and then NetIQ, provided a tool that Lowe's could use to identify the software deployed on its computing systems and the number of user objects for the IDM Products.

**ANSWER:   Paragraph 22 states a legal conclusion to which no response is required.  Answering further, Lowe's states that the MLA speaks for itself.  Lowe's admits that it received software from Plaintiffs that purported to identify the software deployed on Lowe's computing systems and the number of user objects for the IDM Products.  Lowe's denies any remaining factual allegations contained in Paragraph 22.**

23.     The MLA required Lowe's to submit a report on the audit findings each year prior to May 1 and, with the report, submit a purchase order for license fees and Maintenance if the report showed excess copying or use since the prior audit.

**ANSWER:   Paragraph 23 of the Complaint states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 23 to the extent that the use of a term defined in the MLA calls for a legal conclusion.  Answering further, Lowe's states that the MLA speaks for itself.   To the extent there are any factual allegations in Paragraph 23, Lowe's denies them.**

24.    Lowe's submitted annual reports and any associated payments each year until 2012.  But in 2012 Lowe's requested that NetIQ delay the annual audit because of resource constraints at Lowe's.  NetIQ agreed to delay the audit for several months.

**ANSWER:    Lowe's denies any allegation raised in Paragraph 24 to the extent that the use of a term defined in the MLA calls for a legal conclusion.  Lowe's admits the remaining allegations of Paragraph 24.**

25.    Lowe's also represented that it was moving away from utilizing the Enterprise Module.  Because of this representation, NetIQ did not require Lowe's to pay Maintenance for any Enterprise Module licenses during the May 1, 2012 - April 30, 2013 annual period.

**ANSWER:    Paragraph 25 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 25 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Lowe's admits that it had discussions with NetIQ about Lowe's moving away from the Enterprise Module. Answering further, Lowe's states that the Contracts speak for themselves.  Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 25, and therefore denies those allegations.**

26.    Lowe's did pay Maintenance for its 280,000 licenses of IDM for the May 1, 2012 - April 20, 2013 annual period.

**ANSWER:    Lowe's denies any allegation raised in Paragraph 26 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.  Lowe's admits the allegations set forth in Paragraph 26.**

27.     NetIQ pursued the required audit report from Lowe's during the summer and fall of 2012.  In November 2012, Lowe's agreed to engage with NetIQ in the audit process.  Lowe's provided NetIQ with audit data in January 2013 and confirmed the audit results on February 14, 2013.

**ANSWER:     Paragraph 27 of the Complaint states a legal conclusion to which no response is required.  Lowe's admits that it entered into discussions with NetIQ in 2012. Lowe's further admits that it provided NetIQ certain data in January 2013.  Lowe's admits that it exchanged information with NetIQ regarding the purported number of user objects for IDM, but denies that that information accurately represented the number of user objects properly chargeable to Lowe's.  All remaining allegations in Paragraph 27 are denied.**

28.     That audit revealed that Lowe's had greatly exceeded its User License count for IDM.  Indeed, Lowe's had created unique user objects for 109,412 excess Users of IDM.

**ANSWER:     Lowe's denies any allegation raised in Paragraph 28 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.   Lowe's admits that it communicated information to NetIQ regarding the purported number of user objects for IDM, but denies that that information accurately represented the number of user objects properly chargeable to Lowe's.  All remaining allegations in Paragraph 28 are denied.**

29.     Lowe's had not paid license fees for the excess IDM Users and had not paid Maintenance on the excess Users for the May 1, 2012 - April 30, 2013 year.

**ANSWER:   Lowe's denies any allegation raised in Paragraph 29 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.  Lowe's admits that it had not paid for excess IDM licenses or maintenance fees for excess IDM licenses arising from the purported communication of information regarding the number of user objects for IDM, but denies that it was obligated to do so.  Lowe's admits that it offered to pay the licensing and maintenance fees for the number of user objects properly chargeable to Lowe's.  All remaining allegations in Paragraph 29 are denied.**

30.     The audit also revealed that, contrary to its prior representations, Lowe's had not removed the Enterprise Module from its systems.  Instead, it had continued to deploy all 280,000 of its prior User Licenses and had even created 15,054 excess Users.

**ANSWER:   Lowe's denies any allegation raised in Paragraph 30 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Lowe's admits that the Enterprise Module had not been removed from its system, but denies that it was obligated to do so.  Lowe's further denies all remaining allegations in Paragraph 30.**

31.     Lowe's had not paid Maintenance for any of its 280,000 Enterprise Module licenses during the 2012 - 2013 year because of its representation that it was moving away from the software.  Lowe's also had failed to pay license fees or Maintenance for the excess 15,054 Users.

**ANSWER:   Lowe's denies any allegation raised in Paragraph 31 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.  Lowe's admits that it had not paid**

**for any Enterprise Module licenses during the 2012 – 2013 year, but denies that it was obligated to do so.  All remaining allegations in Paragraph 31 are denied.**

32.     Until receiving the audit results, Plaintiffs were unaware of Lowe's actions. Lowe's refuses to pay for licenses and Maintenance as required by the Contracts.

**ANSWER:    Lowe's denies any allegation raised in Paragraph 32 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves. Regarding the factual allegations in Paragraph 32 about Plaintiffs' knowledge, Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations.  Lowe's explicitly denies that it is refusing to make any required payments.   All other allegations contained in Paragraph 32 are denied.**

33.     The Contracts required Lowe's to purchase licenses for the excess IDM and Enterprise Module Users.  They also required Lowe's to purchase Maintenance from May 1, 2012 - April 30, 2013, for the excess Users and for the 280,000 Enterprise Module licenses that Lowe's had failed to remove from its systems.

**ANSWER:    Paragraph 33 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 33 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.   To the extent there are any factual allegations in Paragraph 33, Lowe's denies them.**

34.     Lowe's failed to submit a purchase order for the fees with its audit report as required by the MLA.  In fact, Lowe's refused to pay any of the required fees to bring Lowe's into compliance with the requirements of the Contracts.

**ANSWER:   Paragraph 34 states a legal conclusion to which no response is required.  To the extent there are any factual allegations in Paragraph 34, Lowe's denies them.  Lowe's explicitly denies that it is refusing to make any required payments.**

35.     Plaintiffs provided written notice to Lowe's in a letter dated March 23, 2013, that Lowe's had materially breached the Contracts by failing to make the required payments.  It provided Lowe's 30 days to cure the breach.  Lowe's failed to cure.

**ANSWER:   Lowe's is without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 35, and therefore denies those allegations.  Lowe's explicitly denies that it has failed to make any required payment, and denies that it has failed to cure the alleged breaches.**

36.     On April 30, 2013, Plaintiffs terminated the Contracts because of Lowe's breach.  Lowe's continued to refuse to pay the outstanding license fees and Maintenance.

**ANSWER:   Lowe's admits that Plaintiffs sent a letter dated April 30, 2013 to Lowe's purporting to terminate the Contracts.  Lowe's denies any allegation raised in Paragraph 36 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.  Lowe's explicitly denies that it has failed to make any required payment.  To the extent there are any additional factual allegations in Paragraph 36, Lowe's denies them.**

37.    Lowe's ongoing infringement of copyrights and Lowe's ongoing breaches of contract have injured and continue to injure Plaintiffs.

**ANSWER:    Lowe's denies the allegations set forth in Paragraph 37.**

### FIRST CLAIM
### (COPYRIGHT INFRINGEMENT)

38.    NetIQ realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**ANSWER:    Lowe's incorporates herein and restates, as if fully set forth herein, its responses to the allegations in each of the preceding responses.**

39.    NetIQ is the owner of the Copyrights in and to the IDM Products, and is entitled to bring an action for copyright infringement pursuant to 17 U.S.C. § 101, *et seq.*

**ANSWER:    Paragraph 39 states a legal conclusion to which no response is required.  To the extent there are any factual allegations in Paragraph 39, Lowe's denies them.**

40.    Lowe's exceeded the scope of the Contracts by making unauthorized copies, installations and distributions of the IDM Products, and such actions infringed and continue to infringe exclusive rights granted by the Copyright Act, 17 U.S.C. § 106.

**ANSWER:    Paragraph 40 states a legal conclusion to which no response is required.  To the extent there are any factual allegations in Paragraph 40, Lowe's denies them.**

41.    Lowe's knowingly, willfully, and deliberately infringed the Copyrights in the IDM Products and continues to do so.

**ANSWER:  Paragraph 41 states a legal conclusion to which no response is required.  To the extent there are any factual allegations in Paragraph 41, Lowe's denies them.**

42.    NetIQ suffered and continues to suffer damages as a result of Lowe's actions, in an amount to be proven at trial.

**ANSWER:    Lowe's denies the allegations set forth in Paragraph 42.**

43.    NetIQ's remedy at law is not itself adequate to compensate for injuries inflicted and threatened by Lowe's.

**ANSWER:    Lowe's denies the allegations set forth in Paragraph 43.**

### SECOND CLAIM
### (BREACH OF CONTRACT)

44.    Plaintiffs reallege and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**ANSWER:    Lowe's incorporates herein and restates, as if fully set forth herein, its responses to the allegations in each of the preceding responses.**

45.    Lowe's license and Maintenance rights and obligations are governed by the Contracts.  Each of the Contracts is a valid, enforceable, two-party contract that was accepted by Lowe's.

**ANSWER:  Paragraph 45 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 45 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.  To the extent that there are any factual allegations in Paragraph 45, Lowe's denies them.**

46.     The rights to the IDM Products are conferred by and controlled by the Contracts and such rights are not within the subject matter of the Copyright Act.  Plaintiffs' right to enforce their contractual rights is not equivalent to the exclusive rights under the Copyright Act.

**ANSWER:   Paragraph 46 states a legal conclusion to which no response is required.  To the extent there are any factual allegations in Paragraph 46, Lowe's denies them.**

47.     Lowe's breached and continues to breach independent covenants in the Contracts by failing to pay the required license fees for all Users it created for IDM and the Enterprise Module.

**ANSWER:   Paragraph 47 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 47 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.  To the extent there are any factual allegations in Paragraph 47, Lowe's denies them.**

48.     Lowe's breached and continues to breach independent covenants in the Contracts by failing to pay Maintenance for each excess User of IDM and for all Users of the Enterprise Module.

**ANSWER:   Paragraph 48 states a legal conclusion to which no response is required.  Lowe's denies any allegation raised in Paragraph 48 to the extent that the use of a term defined in the Contracts calls for a legal conclusion.  Answering further, Lowe's states that the Contracts speak for themselves.  To the extent there are any factual allegations in Paragraph 48, Lowe's denies them.**

49.     As a direct and proximate result of these and other breaches of the Contracts, Plaintiffs suffered and are continuing to suffer damages, in an amount to be determined at trial.

**ANSWER:     Lowe's denies the allegations set forth in Paragraph 49.**

50.     Plaintiffs' remedy at law is not itself adequate to compensate for injuries inflicted and threatened by Lowes.

**ANSWER:     Paragraph 50 states a legal conclusion to which no response is required.   To the extent there are any factual allegations in Paragraph 50, Lowe's denies them.**

## Prayers for Relief

**This section of Plaintiffs' Complaint constitutes prayers for relief, which do not require a response.   To the extent that these paragraphs may be deemed to allege any factual or legal entitlements to the relief requested, Lowe's denies every such allegation, including all such allegations contained in paragraphs A through I and their subparts, if any, and specifically denies that Plaintiffs are entitled to the requested relief.**

## Jury Demand

**This section of Plaintiff's Complaint constitutes a jury demand, which does not require a response.**

## ADDITIONAL DEFENSES

1.     Plaintiffs' Complaint fails to state any claim upon which relief may be granted.

2.     Plaintiffs' claims fail because of Plaintiffs' own breaches or violations of the Contracts.

3.      Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, laches, and estoppel.

4.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands for the following reasons:

> (a) Plaintiffs' refusal to accept, consider, or evaluate any corrected audit report from Lowe's following correction of an unintentional computer error was unreasonable and not in good faith.
>
> (b) Alternatively, Plaintiffs represented in their documentation that version 3.1 of the Novell Access Manager ("NAM") was scalable despite knowing that its NAM 3.1 software possessed inherent limitations that constrained the scaling ability needed by customers with challenging NAM requirements or knew that there was insufficient knowledge upon which to base the representation that NAM 3.1 was scalable.  Plaintiffs made the statement about its NAM 3.1 software's scalability to induce Lowe's to purchase a license to NAM 3.1, to pay associated maintenance fees, and to pay for Plaintiffs' services in upgrading and supporting its NAM 3.1 software; and Lowe's, acting reasonably and being ignorant of its falsity, relied on Plaintiffs' representation about NAM 3.1 software's scalability and was induced to purchase a license to NAM 3.1.  Lowe's implementation of NAM 3.1 led to network outages and loss of employee productivity and required Lowe's to expend extensive time and money finding and installing a suitable replacement.

5.      Plaintiffs' claims are barred, in whole or in part, by cure.

6.      Plaintiffs' claims are barred, in whole or in part, due to Plaintiffs' failure to mitigate damages.

7.      Plaintiffs' claims are barred, in whole or in part, by frustration of purpose.

8.      Plaintiffs' claims are barred by fraud as pleaded in detail in the Counterclaims below.

9.      Plaintiffs' claims are barred by negligent misrepresentation as pleaded in detail in the Counterclaims below.

10.     Insofar as Plaintiffs seek injunctive relief arising out of any claim asserted in the Complaint, such relief is inappropriate and unavailable because legal relief and damages provide Plaintiffs an adequate remedy for any claim.

11.     Lowe's is not subject to personal jurisdiction in this District.

**WHEREFORE**, Lowe's respectfully requests that this Court enter judgment in favor of Lowe's and against Plaintiffs (i) dismissing the Complaint with prejudice as to Lowe's, (ii) awarding Lowe's costs and attorney fees, and (iii) granting such other and further relief to Lowe's as the Court deems just and proper.

## COUNTERCLAIMS

Pursuant to Rule 13(a) of the Federal Rules of Civil Procedure, Lowe's, as and for its Counterclaims against Novell and NetIQ, alleges as follows:

### The Parties

1.      On information and belief, Novell is a Delaware corporation with its principal place of business located at 1800 South Novell Place, Provo, Utah 84606.

2.     On information and belief, NetIQ is a Delaware corporation with its principal place of business located at 1223 West Loop South, Suite 810, Houston, Texas 77027.

3.     Lowe's is a North Carolina corporation with its principal place of business located at 1000 Lowe's Boulevard, Mooresville, North Carolina 28117.

## Jurisdiction and Venue

4.     This Court has supplemental jurisdiction over Lowe's Counterclaims pursuant to 28 U.S.C. §1367 because Lowe's Counterclaims are so related to Plaintiffs' claims that Lowe's Counterclaims constitute part of the same case or controversy.

5.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because Novell resides in this District, Plaintiffs have brought their claims in this District, and a substantial part of the events giving rise to the Counterclaims occurred in this District.

## Facts

### A.     MLA and Other Agreements

6.     On October 12, 2000, Lowe's entered into a Master License Agreement and Amendment to Master License Agreement ("MLA") with Plaintiffs.

7.     On December 19, 2003, Lowe's signed an MLA Addendum with Plaintiffs (the "MLA Addendum").  The MLA Addendum stated that the MLA's initial term ended on April 30, 2004.  The MLA Addendum contemplated a series of additional renewed terms constituting separate agreements with additional consideration in the form of additional Licensing and Maintenance fees for Lowe's and technical support and updates from Novell. Either party was entitled to terminate the agreement with written notice at least 60 days prior to the end of each MLA term.  If neither party elected to terminate, the MLA renewed, and Lowe's

incurred additional Licensing and Maintenance fees.  Each subsequent renewed MLA agreement, entered into automatically absent termination every two years, has included this same termination option.

8.     On information and belief, the MLA renewed automatically pursuant to its terms on May 1, 2006, May 1, 2008, May 1, 2010, and May 1, 2012.

9.     Paragraph 11 of the MLA contained an explicit warranty "that the Software will conform substantially to the specifications in the Documentation."  That warranty required Lowe's to provide written notice of non-conformity within 90 days of purchase.

10.     The MLA governed the parties' relationship and Lowe's license rights to certain of Plaintiffs' software products.

11.     Plaintiffs required Lowe's to purchase a license for each of Plaintiffs' software products Lowe's wanted to use.

12.     Plaintiffs also required that Lowe's pay an annual Maintenance fee to use its software.  Plaintiffs justified the Maintenance fees by making available certain software updates or upgrades (regardless of whether Lowe's actually needed or installed the updates or upgrades) and offering its technical services (regardless of whether Lowe's used Plaintiffs' technical services).

13.     In 2010, Plaintiffs changed the way it licensed some of its software products.  For certain software products, a customer would be required to purchase licenses for the number of users that would use the software product, as opposed to the previous per-system license.

14.     Lowe's signed an Instance-to-User License Conversion Addendum ("Conversion Addendum") amending the MLA on April 23, 2010, and Plaintiffs signed the same contract on April 26, 2010.

15.     The Conversion Addendum required that Lowe's "must acquire a user license for each User.  Each person who accesses or uses the Software must have at least one user object uniquely assigned to that person and access the Software through the user object."

16.     The Conversion Addendum defined "User" as follows:

> "User" means a user object in a single directory tree (or other class of object that contains data representing a person, such as objects containing credit card information or PIN numbers) that has (a) access or use rights to any portion of the Software, or (b) access or use rights to products (devices, hardware, or software) being managed by the Software, regardless of whether the user object is assigned to a person or device. User objects (or other classes of objects) representing the same person that are linked to each other within a single tree and/or linked across multiple trees count as only one User.

**B.     *Novell's False or Misleading Representations Regarding Scalability***

17.     As part of the MLA program, Lowe's purchased licenses for three software products: (i) Novell Access Manager ("NAM"), (ii) eDirectory, and (iii) Novell ID Manager ("IDM").

18.     Lowe's used NAM to verify the identity of a user accessing Lowe's network and to confirm the validity of the user's identity.

24

19.     Even in 2000, when Lowe's entered into the MLA with Novell, Plaintiffs knew that Lowe's was a large company that expected to continue growing for the foreseeable future.

20.     A critical, material feature of NAM was its ability to scale the number of servers upon which it ran in order to respond to demands on the system.   On information and belief, Plaintiffs represented in their sales presentations, discussions, and documentation at least as early as 2006 that its NAM software, including version 3.1, was scalable.   Plaintiff's representations about NAM's scalability continued.   For example, a Novell Installation Guide for NAM from 2011 stated as follows:

> This configuration is scalable.   As the number of users increase and the demands for Web resources increase, you can easily add another Identity Server or Access Gateway to handle the load….

21.     Lowe's relied on Plaintiffs' continuous representations regarding the scalability of the NAM software – including a warranty in the MLA that the provided software would conform to the scalability documentation provided to Lowe's – over a period of at least five years.   As a result of this reliance, Lowe's agreed to use and continued to use NAM software, and structured its system architecture around NAM.

22.     Within Lowe's network infrastructure, NAM was responsible for maintaining "single sign on" capability, whereby an employee can log onto the network once and gain access to multiple software and/or hardware systems without needing to login multiple times.

23.     Since approximately 2006, Lowe's has experienced continuous problems with NAM.

### C.      Novell's Software Fails for the First Time

24.     The first major problem with NAM occurred in 2009 when Lowe's attempted to implement a NAM upgrade provided by Plaintiffs.  Lowe's sought and implemented Plaintiffs' recommendations for setting up Lowe's network systems, but the update failed to complete the installation process.

25.     Lowe's sought Plaintiffs' technical support to assist in the upgrade, but Plaintiffs' technical support process was not useful in resolving the problem.

26.     Lowe's IT personnel took it upon themselves to try to resolve the problem on their own.  A second attempt to install the update failed.  Lowe's employees ultimately worked out a rescue plan that led to the successful installation of the update on their third attempt.

27.     During this process, Lowe's incurred significant expenditures of time and money updating NAM.

### D.      Novell's Software Fails for the Second Time

28.     In 2011, Plaintiffs knew that Lowe's planned to revise its internal login website as part of its Integrated Workplace Experience (iWE) revision.

29.     As a result of the problems Lowe's experienced during the 2009 NAM upgrade incident and the ineffectiveness of Plaintiffs' standard technical support capabilities, Lowe's paid Plaintiffs nearly $550,000 above and beyond Plaintiffs' maintenance fees to have a Novell Dedicated Service Engineer ("DSE") stationed at Lowe's corporate IT facility four days per week from April 1, 2011 to April 30, 2013.

30.     In December 2011, when iWE made its first attempt to go live with the revised platform, NAM crashed.

31.     The NAM failure led to serious failures with other software products in Lowe's network.

32.     The NAM failure caused problems for Lowe's network from December 2011 to January 2012.

     **E.**     ***Novell Investigation, at Lowe's Expense, Reveals NAM Cannot Scale.***

33.     Due to the NAM failures in late 2011 and early 2012, Lowe's engaged with Plaintiffs to review Lowe's computer networking architecture and provide recommendations to Lowe's on how to stabilize Plaintiffs' products for Lowe's intended use (hereinafter, the "Architecture Review").

34.     The Architecture Review took Plaintiffs over a month to complete and cost Lowe's in excess $400,000, which was well over Plaintiffs' initial estimate of less than $200,000 for the review.

35.     At the conclusion of Architecture Review, Plaintiffs informed Lowe's that the NAM outage experienced by Lowe's was due to a lack of server capacity for NAM.

36.     Specifically, the increased loads on NAM during iWE implementation had exceeded NAM's capacity to handle the increased loads.

37.     Plaintiffs recommended increasing the computer capacity of the NAM system so that the servers are strong enough to support the increased loads.

38.     At the time, NAM was operating at Lowe's on a cluster of 17 servers.

39.     Plaintiffs admitted that a contributing factor to the NAM crash was the result of a computer error known by Plaintiffs to exist in NAM.

40.    Plaintiffs informed Lowe's that adding additional servers to the NAM cluster would be counterproductive because Lowe's had reached the inherent limits of the version of NAM being used by Lowe's, namely NAM version 3.1.

41.    NAM 3.1, according to Plaintiffs, could only run in a 32-bit operating system, and the servers within the NAM cluster were already configured with the maximum hardware specifications available within the 32-bit architecture limits.

42.    Plaintiffs acknowledged that NAM 3.1's limitations constrained the scaling ability needed by customers with challenging NAM requirements.

43.    Plaintiffs stated to Lowe's that a cluster of 17 servers had already exceeded the optimal number of servers running NAM 3.1.

44.    According to Plaintiffs, adding additional servers would result in a decrease in performance of the NAM 3.1 cluster.

45.    Because of a fundamental limitation to the NAM 3.1 software, NAM was not capable of scaling to address Lowe's needs, in direct contrast to Plaintiff's representations regarding scalability.  Lowe's could not have reasonably discovered this limitation within 90 days of purchasing NAM.

46.    Plaintiffs recommended upgrading to NAM version 3.2, which did not have the same limitations on scaling that version 3.1 had.  Because NAM 3.2 ran on 64-bit architecture, Lowe's could use more powerful servers than its existing servers.

47.    According to Plaintiffs, moving to NAM 3.2 would save Lowe's money because Lowe's could receive the same or greater performance with fewer servers.

**F.     *Lowe's Incurs Significant Expenses to Remediate NAM's Scaling Issues.***

48.     In approximately June 2012, Lowe's decided to replace Plaintiffs' software.

49.     The plan was to replace different portions of Plaintiffs' software in stages with software from a third party.

50.     The transition to the third party software was planned to begin June 2013 and complete in April 2014.

51.     Lowe's entered into a statement of work ("SOW") with Plaintiffs to stabilize NAM until the transition to the third party software could be completed.

52.     Lowe's paid $1.21 million in total fees to Plaintiffs for assisting and advising Lowe's in updating its computer systems.

53.     Lowe's expenditures on new hardware and associated labor as part of the architecture update totaled approximately $200,000.

54.     Since December 2011, Lowe's has made payments of approximately $1.5 million to Plaintiffs arising out of the 2011-12 NAM production outages.

**G.     *Software Glitch Results in Failure to Purge Former Employees***

55.     Separate from Plaintiffs' software, Lowe's used software for maintaining an inventory of current and former Lowe's employees ("HR Software").  This software interfaced with IDM to update the list of current employees who should have an active account.

56.     Lowe's had a corporate policy where former Lowe's employees were removed from various network resources, including IDM, ninety days from their date of termination. During this ninety day period, Lowe's security policies and measures prevent former employees from accessing or using any network resources to obtain materials other than basic personal

financial information, such as pay history and links to external retirement accounts. After ninety days the account is permanently removed.

57.     Lowe's relied on the Novell Identity Manager Integration Module for Enterprise ("Enterprise Module") to synchronize the list of current Lowe's employees, maintained within the HR Software, with the list of current Lowe's employees in IDM. When a Lowe's employee was terminated, the Enterprise Module would provide, among other things, the identity of the terminated employee and the date of the employee's termination. Former employees would be removed from IDM once ninety days had passed since the termination date.

58.     In May 2012, Lowe's upgraded its HR Software. Part of the upgrade involved a change in the way that employees were synchronized between the HR Software and IDM. Instead of using the Enterprise Module, Lowe's informed Novell that it wanted to use Novell's IDM Message System Module ("Message Module") for internal use only.

59.     In response to this request, Novell agreed to sell Lowe's licenses to the Message Module. Novell's sales representative, Frank Hamilton, informed Lowe's that Novell had two different pricing schemes for Message Module licenses, depending on whether the Messaging Module was to be used for internal use or for sending messages outside the company. Novell referred to licenses for external use of the Messaging Module as "Business-to-Consumer/Government-to-Citizen" or "BC-GC" licenses. Mr. Hamilton sold to Lowe's the internal-use Message Module licenses at the discounted price that Novell usually charged for BC-GC Message Module licensing.

60.     Because Lowe's agreed to pay for licenses and maintenance for the Message Module and was no longer going to use the Enterprise Module, Novell waived the licensing and

maintenance fees for the Enterprise Module.  Although Lowe's ceased using the Enterprise Module, Lowe's did not remove the software from its systems out of fear that its deletion could result in unpredictable problems with Novell's other software.

61.    During the HR Software upgrade, the format of the signal communicating a former employee's termination date was accidently altered (e.g., from mm-dd-yyyy to yyyy-mm-dd).  When the date changed, the program responsible for removing former employees after ninety days could no longer determine when to remove former employees, resulting in former employees remaining in IDM longer than ninety days.

### H. Novell Exploits Glitch to Demand Unearned License and Maintenance Fees

62.    Prior to Lowe's discovery of the glitch, Plaintiffs demanded that Lowe's investigate the number of users in its software.

63.    Lowe's complied with Plaintiffs' demand, using Plaintiffs' software, which would purportedly identify the number of user objects.

64.    The output of that software was a large computer file.  Lowe's provided that large computer file to Plaintiffs, but Lowe's did not then know that the file purportedly showing the number of user objects included former employees as a result of the undiscovered glitch.

65.    In a quote dated February 19, 2013, Novell demanded from Lowe's a payment of unearned License and Maintenance fees of $5,175,077.14, which included:

   i.    $3,172,948 for 109,412 licenses for IDM;

   ii.   $798,707.60 for maintenance on 109,412 licenses of IDM;

   iii.  $120,432 for 15,054 licenses for the Enterprise Module;

   iv.   $30,108 for maintenance on 15,054 licenses for the Enterprise Module;

      v.      $84,000 for 280,000 licenses for the Enterprise Module for B-C/G-C;

     vi.      $664,376 for 83,047 licenses for internal-use Message Module; and

    vii.      $304,505.54 for maintenance on 83,407 licenses for internal-use Message Module.

66.     Lowe's identified the glitch, which was simply a termination date formatting error, fixed the glitch, and determined the proper number of users with terminated users removed from IDM.  The results showed a user overage of 6,944, as compared to the overage identified by Novell in the February 19, 2013 demand of 109,412 users.

67.     Lowe's informed Plaintiffs that the user count in their February 19, 2013 demand was erroneous because it resulted from a computer glitch.

68.     As of January 2013, the total number of employees in IDM was 286,944, or 6,944 more than the number of user licenses Lowe's had purchased.  Intending to pay the corresponding fees, Lowe's attempted several times to communicate these findings and a corrected and accurate report of user objects to Plaintiffs.  Lowe's efforts constituted good faith efforts to perform its contractual obligations, demonstrating reasonable diligence and a bona fide desire to fulfill its obligations.

69.     Plaintiffs refused to accept or consider Lowe's cure.  Plaintiffs refused to accept or consider any corrected, accurate report of user objects and the corresponding offered fees.

70.     On March 26, 2013, more than a month before the DSE's contract had expired, Plaintiffs unilaterally withdrew their DSE from Lowe's facilities.

71.     Plaintiffs unilaterally terminated the Contracts on April 30, 2013.

72.     Plaintiffs' software is integral to Lowe's current system architecture, and cannot be immediately replaced.  Loss of the software would make it difficult, if not impossible, for Lowe's to conduct business in an ordinary manner.

73.     Lowe's cannot immediately cease use of the Plaintiffs' software without immediate, substantial, irreparable harm.

### FIRST COUNTERCLAIM
#### (BREACH OF CONTRACT)

74.     Lowe's incorporates herein and restates its preceding allegations as if fully set forth in their entirety.

75.     Lowe's and Plaintiffs signed the MLA, which provided that Plaintiffs would provide Lowe's licenses to use certain of Plaintiffs' software.

76.     Under Utah law, the Contracts are subject to an implied covenant of good faith, which requires the Plaintiffs, among other things, to exercise reasonably and in good faith Plaintiffs' rights to request an audit and to terminate the Contracts.

77.     Plaintiffs alleged that Lowe's was in breach of contract for failing to pay for excess user license fees.

78.     To cure Plaintiffs' allegations of breach of contract, Lowe's attempted to provide Plaintiffs a corrected and accurate report of user objects, intending to make the corresponding payment of IDM License fees and associated Maintenance fees for the 6,944 additional users that had active accounts.

79.     Lowe's attempt to cure was made within the cure period provided in the Contracts.

80.     Plaintiffs refused to accept Lowe's attempt to cure.

81.     Plaintiffs' subsequent termination of the MLA was unilateral and not made in good faith.

82.     Plaintiffs breached and continue to breach their obligations under the Contracts to ensure that Lowe's has access to the most current software revisions and available technical support.

83.     Plaintiffs prematurely withdrew their DSE from Lowe's facilities.

84.     Plaintiffs breached and continue to breach their obligations under the Contracts by withholding without cause licenses to their software products.  Additionally, Plaintiffs' refusal to accept or consider Lowe's corrected and accurate report of user objects following correction of an unintentional computer glitch was unreasonable and not in good faith

85.     As a direct and proximate result of these and other breaches of the Contracts, Lowe's suffered and is continuing to suffer damages, in an amount to be determined at trial.

86.     Lowe's remedy at law is not itself adequate to compensate for injuries inflicted and threatened by Plaintiffs.

87.     Lowe's is entitled to specific performance of Plaintiffs' obligations under the Contracts.

**SECOND COUNTERCLAIM**
**(NEGLIGENT MISREPRESENTATION)**

88.     Lowe's incorporates herein and restates its preceding allegations as if fully set forth in their entirety.

89.     On information and belief, Plaintiffs represented in their sales presentations, discussions, and documentation that its NAM 3.1 software was scalable.

90.    Plaintiffs' NAM 3.1 software possessed inherent limitations that constrained the scaling ability needed by customers with challenging NAM requirements.

91.    Plaintiffs' repeated representations, made prior to April 2010, that NAM 3.1 was scalable was a careless or negligent misrepresentation of a material fact.

92.    Plaintiffs had a pecuniary interest in the transaction, since they were attempting to induce Lowe's to purchase a license to NAM 3.1, to pay associated maintenance fees, and to pay for Plaintiffs' services in upgrading and supporting the NAM 3.1 software.

93.    Plaintiffs were in a superior position to know that NAM 3.1 had scaling limitations.

94.    Plaintiffs should have reasonably foreseen that Lowe's was likely to rely upon the misrepresentation about its NAM 3.1 software's scalability.

95.    Lowe's, acting reasonably and being ignorant of its falsity, justifiably relied on Plaintiffs' representation about NAM 3.1 software's scalability and was induced to purchase a license to NAM 3.1.

96.    Plaintiffs owed Lowe's a duty of care in the negotiation of a contract for the NAM 3.1 software.

97.    Lowe's implementation of NAM 3.1 led to network outages and loss of employee productivity and required Lowe's to expend extensive time and money finding and installing a suitable replacement.

### THIRD COUNTERCLAIM
#### (FRAUDULENT INDUCEMENT)

98.    Lowe's incorporates herein and restates its preceding allegations as if fully set forth in their entirety.

99.     On information and belief, Plaintiffs represented in their sales presentations, discussions, and documentation prior to April 2010 that its NAM 3.1 software was scalable.

100.     On information and belief, Plaintiffs knew that its NAM 3.1 software possessed inherent limitations that constrained the scaling ability needed by customers with challenging NAM requirements or knew that there was insufficient knowledge upon which to base the representation that NAM 3.1 was scalable.

101.     Plaintiffs did not share their knowledge that NAM 3.1 had scaling limitations with Lowe's.  In fact, the MLA included a warranty that NAM 3.1 would conform to the scalability documentation, despite Plaintiffs' knowledge to the contrary, and despite the fact that Lowe's could not reasonably discover the undisclosed scalability limitations of NAM 3.1 within the 90 day warranty period.

102.     Plaintiffs made the false statements about its NAM 3.1 software's scalability to induce Lowe's to purchase a license to NAM 3.1, to pay associated maintenance fees, and to pay for Plaintiffs' services in upgrading and supporting its NAM 3.1 software.

103.     Lowe's, acting reasonably and being ignorant of its falsity, relied on Plaintiffs' representations, including a warranty, about NAM 3.1 software's scalability and was induced to purchase a license to NAM 3.1.

104.     Lowe's implementation of NAM 3.1 led to network outages and loss of employee productivity and required Lowe's to expend extensive time and money finding and installing a suitable replacement.

**WHEREFORE**, Lowe's respectfully prays that this Court grant the following relief:

a.     For judgment in favor of Lowe's on the breach of contract claim for relief;

36

b.     For judgment in favor of Lowe's on the breach of implied warranty of good faith claim for relief;

c.     For judgment in favor of Lowe's on the fraudulent inducement claim for relief;

d.     For judgment in favor of Lowe's on the negligent misrepresentation claim for relief;

e.     For an order reinstating Lowe's license rights to Plaintiffs' software upon payment for 6,944 user licenses and associated maintenance fees for IDM;

f.     For entry of an order of specific performance requiring Plaintiffs to fulfill their obligations under the Contracts;

g.     For an award of actual damages for Plaintiffs' breaches of contract, including but not limited to product licensing fees, maintenance fees, and consulting fees;

h.     For an award of costs, including reasonable attorney fees, pursuant to the Contracts or any other basis permitted by law or the equitable powers of the Court;

i.     For an award of pre-judgment and post-judgment interest on all applicable amounts; and

j.     For such other and further relief as the Court may deem equitable and proper.

## **Jurisdiction and Venue**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Lowe's demands TRIAL BY JURY of all claims and issues so triable.

DATED this 16th day of August, 2013.

RAY QUINNEY & NEBEKER

/s/ Mark M. Bettilyon
Mark M. Bettilyon

John Gary Maynard, III
Joshua M. Kalb
Paul T. Nyffeler
HUNTON & WILLIAMS

*Attorneys for Defendant Lowe's Companies, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 16th day of August, 2013, a copy of the

foregoing **ANSWER AND COUNTERCLAIMS** was filed with the Clerk of Court using the

CM/ECF system, which sent notification of such filing to the following:

Sterling Arthur Brennan
Tyson K. Hottinger
MASCHOFF BRENNAN
20 Pacifica, Ste. 1130
Irvine CA 92618
sbrennan@mabr.com
thottinger@mabr.com


/s/ Lori M. McGee

1245677